# EXHIBIT A

**EXPERIAN INFORMATION SOLUTIONS, INC.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF ORDER PERMITTING DEFENDANTS TO
SHARE INFORMATION CONCERNING LARQUETTE GREEN IN DISCOVERY**



5 of 29 DOCUMENTS



Analysis
As of: May 05, 2010

**AUTOTECH TECHNOLOGIES LIMITED PARTNERSHIP, Plaintiff, v. AUTOMATIONDIRECT.COM, INC., TIMOTHY HOHMANN and KOYO ELECTRONICS INDUSTRIES CO., LTD., Defendants. AUTOMATIONDIRECT.COM, INC., Plaintiff, v. AUTOTECH TECHNOLOGIES L.P., AVG ADVANCED TECHNOLOGIES, INC., SHALLI INDUSTRIES, INC., and SHALABH KUMAR, Defendants.**

**No. 05 C 5488**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 69125*

**September 17, 2007, Decided**

**SUBSEQUENT HISTORY:** Motion denied by, Sanctions disallowed by *Autotech Techs., L.P. v. AutomationDirect.com, Inc.,* 2007 U.S. Dist. LEXIS 69135 (N.D. Ill., Sept. 18, 2007)

**PRIOR HISTORY:** *Autotech Techs., Ltd. P'ship. v. AutomationDirect.Com, Inc.,* 2007 U.S. Dist. LEXIS 68116 (N.D. Ill., Sept. 12, 2007)

**COUNSEL:** [*1] For Autotech Technologies Limited Partnership, an Illinois limited partnership, Plaintiff: Kenneth M Suggs, LEAD ATTORNEY, Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Cary S. Fleischer, Chuhak & Tecson, Chicago, IL; David Seth Argentar, Sanjay Shivpuri, Chuhak & Tecson, P.C., Chicago, IL; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For AutomationDirect.Com, Inc., Defendant: Robert Eliot Shapiro, LEAD ATTORNEY, Barack Ferrazzano

Kirschbaum & Nagelberg LLP, Chicago, IL; Alan R. Lipton, Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL; James A. Trigg, Susan A Cahoon, Kilpatrick Stockton LLP, Atlanta, GA; Virginia S Taylor, Kilpatrick Stockton, Atlanta, GA.

For Timothy Hohmann, Defendant: Alan R. Lipton, Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL; James A. Trigg, Susan A Cahoon, Kilpatrick Stockton LLP, Atlanta, GA; Robert Eliot Shapiro, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL; Virginia S Taylor, Kilpatrick Stockton, Atlanta, GA.

For Koyo Electronics Industries, Co., Ltd., Defendant: James A. Trigg, LEAD ATTORNEY, Susan A Cahoon, LEAD ATTORNEY, Kilpatrick Stockton LLP, Atlanta, GA; Virginia S Taylor, LEAD ATTORNEY, [*2] Kilpatrick Stockton, Atlanta, GA; Robert Eliot Shapiro, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL; Wendi E. Sloane, Barack, Ferrazzano,

Kirschbaum, & Nagelberg, Chicago, IL.

For AutomationDirect.Com, Inc., Counter Claimant: Barry Francis MacEntee, Hinshaw & Culbertson, Chicago, IL.

For Autotech Technologies Limited Partnership, an Illinois limited partnership, Counter Defendant: Cary S. Fleischer, LEAD ATTORNEY, Chuhak & Tecson, Chicago, IL; Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For Autotech Technologies Limited Partnership, an Illinois limited partnership, Counter Defendant: Francis M. Hinson, Janet, Jenner & Suggs, LLC, Columbia, SC; Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

For AVG Advanced Technology Limited Partnership, Shalabh Kumar, Counter Defendants: Keith Allen Klopfenstein, Keith A. Klopfenstein, Esq., Chicago, IL.

**JUDGES:** Jeffrey Cole, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Jeffrey Cole

**OPINION**

**MEMORANDUM OPINION AND ORDER RE: AUTOTECH'S MOTION TO COMPEL DISCOVERY REGARDING CUSTOMER INFORMATION**

The Court: [The dispute over the production of computer information is] certainly [*3] going on and on and on and on.

ADC: Well, let me explain what's been going on and on and on and on --

Court: Hold it . . . it's Autotech's motion.

* * *

Autotech: Your honor, it has been going on and on and on and on. . . .

(Hearing Transcript of 6/6/07).

Although the issue of the extraction of the information goes back to February 26, 2007, the passage of seven months has not seen its resolution. In this episode of the saga, Autotech again seeks an order compelling ADC to produce discovery regarding "customer information," which apparently is contained in some 60,000 invoices stored in electronic format in ADC's computer database. The history of this dispute gives point to the quip made by ADC's counsel who said that despite ADC's willingness to produce the information, "Autotech won't take *yes* for an answer." Essentially, the parties were, and continue to be at odds over whether ADC has already produced the information that would be contained in those invoices in another form. ADC insists that it has done all it possibly can do to satisfy Autotech and continues to offer its utmost cooperation. According to Autotech, ADC has made no good faith attempt to produce the information and is thwarting [*4] court orders and instructions in the process.

In February, 2007, ADC had indicated to Autotech that it was too burdensome to extract information regarding 56,000 to 60,000 customer invoices from their computer system. It would involve perhaps 3000 man-hours at a cost of $ 40,000 to $ 60,000. (Hearing Transcript of 2/26/07 at 16-17, 21, 24-25). Autotech insisted that it was simplicity itself to extract the information, that there should be no cost, and that ADC was opposed to producing the information. ADC insisted that it was perfectly willing to produce the information so long as it did not have to absorb all the costs. (ADC's Response Brief, Ex. 2, Tr., at 32-33).

In light of ADC's willingness to produce the information, and Autotech's seeming equivocation, I posed the question to Autotech's counsel suggested by ADC's lawyer: "And my question to you is I want to see if you will take yes for an answer?" He responded: "Yes." *Id.* But just moments later, there appeared to be some slippage in Autotech's position, and it insisted that the information be extracted through the use of a specific program. (Tr., at 33-34). In the end, although there were some intermediate objections to the process, [*5] it was agreed that Autotech would pay the reasonable costs of extracting the information. (Tr. 33). All was -- or seemed -- well. It was not to be.

Just a few weeks after the hearing, on March 13, 2007, (Dkt. # 279), Autotech filed a motion for sanctions,

along with a motion to compel production of the customer information at issue. I denied the motion as moot given the agreement the parties had reached at the February 26, 2007 hearing. (Dkt. # 299, 304). I also ordered ADC to promptly provide an estimate of the cost of extracting the information from its computer system.

ADC wrote to Autotech on March 29, 2007and included various estimates, which now totaled $ 80,000 for generating about 180,000 documents, and printing them at 32 cents apiece. (*Brief of ADC in Response,* Taylor Decl. P 5, Ex. 1; *Memorandum of Autotech in Support of Its Motion,* Ex. 3, at 25). Autotech did not reply to the letter. (*Brief of ADC in Response,* at 6; *Memorandum of Autotech in Support of Its Motion,* Ex. 3, at 25). It had what it thought was a much better idea. Autotech filed yet another motion to compel and for sanctions on June 4, 2007, and the parties were back before me on June 6, 2007. They seemingly had [*6] made no progress since ADC submitted the cost estimates to Autotech, more than two months earlier. But Autotech had used that time to come up with a plan and a visual aid to explain it:

> Autotech: We have been telling the other side ever since I have been involved in this case that it's a matter of running a simple search on a program. We actually got a DVD with the motion showing it takes 2 minutes and 40 seconds to run this search that we are asking for. And so you know, having not gotten it resolved at this point of time, we filed a motion.
>
> * * *
>
> All we really need to do, your Honor, is have somebody sit down at the computer console and put in these key stokes that we have outlined and see if it produces the report we are looking for. If it doesn't, then maybe $ 80,000 --

(Hearing Transcript of 6/6/2007, at 10, 19). The use of a program of its choosing is the approach Autotech advanced at the February 26th hearing.

The fact that a specific program, once rejected, was again part of the mix was news to ADC. The agreement the parties had been operating under for the extraction of the information had only one open term: the cost. After

ADC provided estimates, the only issue ought to have [*7] been how much Autotech would pay. Autotech had never mentioned the "simple search on a program" in the negotiations leading up to the June 4th motion to compel and for sanctions. (Hearing Transcript of 6/6/2007, at 12-13). From ADC's representations at the hearing -- representations that Autotech did not challenge -- it is clear that Autotech did not even broach this new topic with ADC. (Hearing Transcript of 6/6/2007, at 13-14).

What that means is that Autotech filed its June 4th motion in violation of both Federal and Local Rules requiring that the parties confer in good faith in an effort to secure the discovery at issue without court intervention. *Fed.R.Civ.P. 37(a)(2)*; *Local Rule 37.2.* True, Autotech provided a certification along with its motion, but it is an empty form if Autotech does not actually confer in good faith with its opponent. Thus the motion could have been denied for failure to comply with both rules. *Kalis v. Colgate-Palmolive Co., 231 F.3d 1049, 1059 (7th Cir. 2000).* [1] Instead, the negotiations regarding the implementation of this "simple search program" -- negotiations that Autotech should have initiated before filing its motion -- occurred at the hearing. [*8] Nonetheless, the approach was not rejected out of hand:

> The Court: Now you come up with what [ADC] calls a new way to something different and maybe that's a good way to do it. Maybe that solves all the problems.
>
> * * *
>
> The question then is why should we not try to do what this gentleman says you should do and see what the result is.
>
> ADC: We're happy to do that. We had no opportunity to do that before showing up today. We didn't even have the materials that were necessary, but we are willing to do it and we will come back.

(Hearing Transcript of 6/6/2007, at 20-21). Autotech then provided ADC with the search program DVD, and a deal was worked out, or so it seemed:

> ADC: We are perfectly willing if this works to do it this way. It's not a way that we had thought of, heard of, or believed, based on what we have been able

preliminarily to look at. We don't think it
will work on their system.

We can do one of two things. We can
have Mr. Spiller [of ADC] try to follow
and work through these steps and see if it
will run, but then they will have questions
about was Mr. Spiller really making a
good go of it and acting in good faith, or if
you think that an outside computer expert
wants to come down [*9] to Georgia
tomorrow and sit down on that computer
and see if he can make this happen, let him
do it.

The Court: What could be better than
that?

ADC: Exactly.

The Court: I mean, that's a fair offer.

Autotech: And I accept that offer....

(Hearing Transcript of 6/6/2007 at 22).

1    Noncompliance with local rules has caused
Autotech difficulties in this and other cases. *See*
Minute Order of 6/29/07 (Docket 355); Minute
Order of 8/24/07 (Docket 388); *Autotech
Technologies LP v. Integral Research &
Development Corp.,* 499 F.3d 737, 2007 U.S.
App. LEXIS 20615, 2007 WL 2429480 (7th Cir.
2007).

Pursuant to this agreement, Autotech's attorneys
hired two technology and database experts, Leon
Bouknight and Craig Barnes, to extract the relevant data
from ADC's computer systems. ADC and Autotech set a
date for June 13, 2007. Following the hearing, the parties
exchanged emails to confirm the event and its
parameters. Autotech indicated that it would be sending
an attorney and two independent contractor computer
technicians. (*Autotech's Memorandum in Support,* Ex. 8).
The two technicians "would access the . . . database to
retrieve the following information: customer name,
address, invoice number, invoice date, part number,
product description, quantity [*10] shipped and price for
all products in the EZTouch and EZText lines." (*Id.*).
Autotech suggested that they also retrieve the same
information about C-More products -- information that

was then the subject of another motion to compel. In
response, ADC confirmed the procedure, but demurred at
the proposal to extract C-More data as well. (*Id.*). ADC
explained that "[i]f the proposed method for retrieving
the information outlined below actually works, our
client's IT people will be observing and will know how to
do the same procedure in the future . . . ." (*Id.*).

Things did not go smoothly on June 13th. The
procedure was not as simple as Autotech advertised, and
ADC, it can be argued, was perhaps not as cooperative as
it suggests. In short, the exercise did not work According
to ADC, Autotech's computer technicians were
unfamiliar with the computer search program that
Autotech had touted at the hearing -- they had never seen
the DVD. (*Brief of ADC in Response,* Taylor Decl., P 7).
That made impossible fulfillment of Autotech's promise
that the information could be extracted in less than three
minutes by following the "key strokes that [Autotech]
outlined [in the DVD]." Additionally, Autotech [*11]
was aware that it was not going to have unfettered access
to ADC's database -- that had been made clear at the
February 26th hearing and at every subsequent
discussion.

According to Autotech, however, ADC took that to
the extreme. Autotech's technicians were not allowed to
touch the computer -- they had to relay instructions
through one of ADC's employees. That was not what
ADC had agreed to at the hearing -- counsel said the
outside experts could sit down at the computer -- or in
subsequent emails -- ADC technicians would simply
observe. In addition, ADC understandably did not allow
any deviation from the steps in the DVD. (*Autotech's
Memorandum in Support,* at 4-5; *Autotech's Reply Brief,*
Ex. 7, Barnes Decl., P 4). ADC claims that this was
owing to the fact that the system was a "live" system,
running ADC's business, and ADC was leery of trial and
error experimentation on its system. (*Brief of ADC in
Response,* Taylor Decl., P 8; Marchuk Decl. P 4-5).

This is somewhat understandable, although, given
the manner in which computer data systems vary, ADC
had to have foreseen *some* deviation from the example in
the DVD. According to Autotech, all its experts needed
was a "better view and [*12] understanding of the
database system in which they were working."
(*Autotech's Reply Brief,* at 7). It is impossible to
determine whose fault it was, if anyone's, because the
current dispute, like others since the case began, involves

a clash of pretending and remorselessly conflicting absolutes. *Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc., 235 F.R.D. 435, 446 (N.D.Ill. 2006).* But what is beyond dispute is that Autotech's plan to employ the supposedly simple and infallible search program on the DVD was something new that Autotech introduced at the June 6th hearing as a possible alternative to the expensive retrieval plan ADC said was the only way the information could be retried from its computer system. It did not work. That leaves the original plan. The only question is who is to pay.

A district court has broad discretion to protect a responding party from undue burden or expense in discovery by shifting some or all of the costs of production to the requesting party. *Rule 26(c)*; *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978).* Cost-shifting often occurs in cases involving the retrieval of electronically stored data, that is inaccessible except [*13] through means that involve undue burden or expense. *Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318 (S.D.N.Y.2003)*; *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp., 222 F.R.D. 594, 600 (E.D. Wis.2004)*; *United States v. Amerigroup Illinois, Inc., 2005 U.S. Dist. LEXIS 24929, 2005 WL 3111972, *4 (N.D.Ill. Oct. 21, 2005).* The difficulties in determining what part of the $ 80,000 cost is "reasonable" and thus taxable to Autotech are avoidable in this case because Autotech agreed months ago to pay the costs when the estimate was between $ 40,000 and $ 60,000. A reasonable allocation in this case is that Autotech should pay 62% of the $ 80,000 expenditure (which is the middle of the original range of $ 40,000 to $ 60,000), but not to exceed $ 60,000. The remainder will be paid by ADC. This is consistent with ADC's promise "to pay whatever share of [the costs I] determined was unreasonable, whether it was zero . . . it was all reasonable, or some larger amount. . . ." (Hearing Transcript of 6/6/2007, at 12). This is a binding commitment. *Cf. Tamari v. Bache & Co., 729 F.2d 469, 472 (7th Cir. 1984)*(attorney's promise in open court to produce documents); *Doi v. Halekulani Corp., 276 F.3d 1131, 1138 (9th Cir. 2002).* [*14] In addition, ADC must provide proof of actual cost to Autotech and proof of actual payment. If ADC is able to extract the information for less than $ 80,000 or if the parties arrive at a different cost-shifting formula, that will control. [2]

2  Since Autotech filed its most recent motion to

compel and for sanctions, ADC has offered to create a "static clone" of its database system and allow Autotech's consultants to run searches that are narrowly tailored to elicit the information Autotech has requested. This would allow the consultants to search the data as it existed at a single moment in time -- a snapshot, as it were -- and attempt to produce the proposed report without interfering with ADC's live, operating electronic sales processing system. Autotech has rejected this proposal, arguing that the restrictions that ADC is placing on its use of the data were too limiting to allow any real analysis, and is bristling -- understandably, given the June 13th results -- at ADC's condition requiring Autotech withdraw its motion to compel regardless of the outcome of this exercise.

Paper is patient, as Justice Frankfurter liked to say. Charges and denials are a key-stroke away, and voluminous [*15] exhibits consisting of self-serving emails and letters often confound rather than clarify things. Ascertaining what really happened and who is to blame (or in what proportions blame should be allocated) for the current impasse would take even more effort and time than has been expended and would require an evidentiary hearing at which the lawyers would have to testify, and credibility determinations would have to be made. Perhaps realizing the unseemliness of such a proceeding and the potentially embarrassing consequences that would result from those credibility determinations, neither side has asked for a hearing.

ADC and Autotech agreed that the documents would be produced. That agreement is still in place. Both parties agreed that I should exercise my discretion and allocate costs. I have done so. If Autotech still wants the documents, it must notify ADC in writing within five days, and the documents must be produced within twenty-one days thereafter. If Autotech no longer wants the documents, it must so inform ADC in writing within five days. If the required notification does not occur, Autotech's request will be deemed waived.

As the parties conceded months ago, this dispute "has [*16] been going on and on and on and on." At some point, all litigation must come to an end. For this issue, the time has come. [3]

3  Public policy has always dictated that at some point "there be an end of litigation...." *Baldwin v.*

*Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525, 51 S. Ct. 517, 75 L. Ed. 1244 (1931)*. The shortness of life and manifest necessity in part underlie the principle. In 1926, Cardozo lamented that "the fecundity of our case law would make Malthus stand aghast." The Growth Of The Law, 4. In 1926, there were 300 volumes in the first series of the Federal Reporter and 12 in the Second, and both contained the decisions of the district courts as well as the circuit courts of appeals. Today, the Federal Reporter is in its third series and has grown to over 1,700 volumes. The Federal Supplement, which did not even begin until 1932, has grown to more than 1,400 volumes (in two series). The Supreme Court Reports now stand at 550 volumes.

In 1926, volume 12 of the Federal Reporter 2d. was under 1,000 pages even with its combined contents. Volume 485 F.3d is almost 1,400 pages in length, and, of course, does not include district court opinions or the "unpublished opinions" of the courts of appeals, which, [*17] according to current statistics, comprise approximately 80% of the courts of appeals' annual production..

Even this does not begin to tell the whole story. The bankruptcy, tax court, and magistrate judges -- to say nothing of the outpouring of the state courts -- are turning out opinions in record numbers.

**CONCLUSION**

For the foregoing reasons, Autotech's motion to compel against ADC and Timothy Hohmann [# 334 and # 351] is DENIED. That part of the motion seeking sanctions is also DENIED.

**DATE:** 9/17/07

Jeffrey Cole

**UNITED STATES MAGISTRATE JUDGE**

# EXHIBIT B

**EXPERIAN INFORMATION SOLUTIONS, INC.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF ORDER PERMITTING DEFENDANTS TO
SHARE INFORMATION CONCERNING LARQUETTE GREEN IN DISCOVERY**

LEXSEE



Cited
As of: May 05, 2010

## CATHERINE S. ZUKOSKI v. PHILADELPHIA ELECTRIC COMPANY

### CIVIL ACTION NO. 93-4780

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

#### 1994 U.S. Dist. LEXIS 16187; 66 Fair Empl. Prac. Cas. (BNA) 664

#### November 14, 1994, Decided
November 14, 1994, Filed, Entered

**COUNSEL:** [*1] For CATHERINE S. ZUKOSKI: RICHARD A. ASH, LYMAN AND ASH, PHILA. PA.

For PHILADELPHIA ELECTRIC COMPANY: CONRAD O. KATTNER, PECO LEGAL DEPARTMENT, PHILA. PA. WENDY SCHERMER, PHILA, PA.

For PHILADELPHIA HOUSING AUTHORITY: MARIE A. FRITZINGER, PHILADELPHIA HOUSING AUTHORITY, PHILA, PA.

**JUDGES:** VanARTSDALEN, S.J.

**OPINION BY:** DONALD W. VANARTSDALEN

**OPINION**

*MEMORANDUM & ORDER*

VanARTSDALEN, S.J.

November 14, 1994

Plaintiff, Catherine S. Zukoski, seeks an order compelling the Philadelphia Housing Authority (PHA), a non-party to this action, to comply with a deposition subpoena requesting testimony and production of the personnel files and other documents relating to a former employee, Hillary McAndrews. For the reasons discussed below, the motion to compel will be denied. The plaintiff has filed employment discrimination claims under Title VII and the ADEA against the defendant Philadelphia Electric Company (PECO), claiming she was denied the position of Market Research Supervisor at PECO due to age and sex discrimination. The position was awarded instead to Hillary McAndrews. [1] McAndrews had worked for the PHA until moving to PECO to take the Market Research Supervisor position.

> 1    Because both the plaintiff and Hillary McAndrews are of the same sex (female) it seems unlikely that plaintiff can even establish a prima facie sex discrimination claim under the standards established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and its progeny.

[*2] On October 4, 1994, the plaintiff served a subpoena upon the PHA seeking testimony and the production of files concerning McAndrews' work history at the PHA. The subpoena commanded PHA representatives competent to testify about McAndrews' work history to make themselves available for an October 12 deposition. [2] The subpoena also commanded PHA representatives to "produce and permit inspection and copying of . . . documents" related to McAndrews' work

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 10 of 30 PageID #:432

1994 U.S. Dist. LEXIS 16187, *2; 66 Fair Empl. Prac. Cas. (BNA) 664

history. [3]

2    Specifically, Attachment A to the subpoena demanded that the PHA representatives competent to testify on the following subjects appear:

1. The employment title, job function, salary and the employment activities of Hillary Nilsson McAndrews during the time she was employed by PHA.

2. Any activities carried out by Ms. McAndrews in changing or upgrading any PHA telephone systems during her employment with PHA.

3. Any activities McAndrews carried out in computerization of PHA records of its utility expenses.

4. Any activities McAndrews carried out before any gas or other utility regulatory commissions on behalf of PHA.

5. Any activities carried out by McAndrews to achieve more economic sourcing for PHA gas purchases and any savings to PHA that resulted from her activities.

6. The validity of McAndrews [sic] contentions that she saved PHA 650,000 dollars during her first year of employment.

7. Any other employment activities Ms. McAndrews carried out during her employment with PHA.

8. Any evaluations of Ms. McAndrews employment performance with PHA.

[*3]

3    The subpoena commanded that PHA representatives bring with them the following documents:

1. Hillary McAndrews complete employment file.

2. Any studies or reports created by Ms. McAndrews during her employment with PHA, including, but not limited to the following subjects: (i) any surveys taken of PHA residents

(ii) changes in PHA telephone equipment (iii) PHA purchase of gas (iii) water usage at PHA housing facilities (iv) changing from gas to electric pilot ignition in the stoves in PHA units (v) billing PHA residents for utility use, and (vi), computerization of PHA utility expenses.

3. Documents that support Ms. McAndrews contention that she saved PHA $ 650,00 in her first year of employment.

In a letter dated October 7, 1994, Marie Fritzinger, counsel for the PHA, stated that "it is the policy of the Philadelphia Housing Authority not to release information concerning employees, past or present, without their express written consent. Accordingly, I do not see the need for anyone from the [PHA] to appear for this subpoena." On October 12, 1994, no one from the PHA appeared at the deposition, [*4] and no documents were produced.

Federal Rule of Civil Procedure 30(b)(1) provides for taking depositions of non-parties. "A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the actions. . . . If a subpoena duces tecum is to be served on the person to be examined, the designation of the materials to be produced as set forth in the subpoena shall be attached to, or included in, the notice." The exhibits attached to the plaintiff's motion clearly indicate that the plaintiff met these basic requirements.

Federal Rule of Civil Procedure 45(d)(1) states, in pertinent part:

The person to whom the subpoena is directed may, within 10 days after the service thereof or on or before the time specified in the subpoena for compliance if such time is less than 10 days after service, serve upon the attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials except pursuant to an order of the court from which the subpoena was issued.

[*5] The PHA letter dated October 7, 1994, constituted a "written objection," pursuant to Rule 45(d)(1). The

Page 2

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 11 of 30 PageID #:433

1994 U.S. Dist. LEXIS 16187, *5; 66 Fair Empl. Prac. Cas. (BNA) 664

plaintiff, therefore, was required to file the instant motion to compel in order to proceed with her discovery request.

The PHA's written objection to the deposition rested only on the asserted policy of not releasing information about employees. [4] However, PECO and the PHA, in the briefs they submitted in opposition to the plaintiff's motion, do not rely on a privilege claim, but instead argue that the discovery request should be denied because it seeks information irrelevant to the plaintiff's employment discrimination claim. [5] I agree.

4   A number of federal courts have considered claims that personnel records are per se privileged material under federal law. These claims have been routinely rejected. In *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1519 n.6, the defendants contended that personnel records were protected by privilege. The court stated simply that "personnel files are discoverable in federal question cases, including Title VII actions, despite claims of privilege." *Id. See also Breed v. United States Dist. Ct. for the N.D. of Cal.*, 542 F.2d 1114, 1115 (9th Cir. 1976) ("the contention that the doctrine of governmental privilege precludes disclosure of personnel records . . . is not the law"); *Kerr v. United States Dist. Ct. for the N.D. of Cal.*, 511 F.2d 192, 197 (9th Cir. 1975), aff'd, 426 U.S. 394, 48 L. Ed. 2d 725, 96 S. Ct. 2119 (1976). In *Weahkee v. Norton*, 621 F.2d 1080, 1082 (10th Cir. 1980), the Tenth Circuit reversed the district court's holding that plaintiff was not entitled to discover personnel files of other employees who had been promoted over him. *See also Fears v. Burris Mfg. Co.*, 436 F.2d 1357, 1360-61 (5th Cir. 1971) (court required production of records of state employment office in Title VII action); *Renshaw v. Ravert*, 82 F.R.D. 361, 363 (E.D. Pa. 1979) (ordering disclosure of personnel file of defendant police officer). Plaintiff's broad assertion of privilege, as stated in the October 7, 1994 letter, therefore, cannot stand alone as a reason to deny the plaintiff's motion.

[*6]

5   PECO and the PHA filed separate briefs in opposition to the plaintiff's motion. However the PHA's brief "relied on and incorporated . . . the legal arguments set forth in the Brief of Defendant PECO." (PHA's Brief at 1.)

PECO and the PHA argue that the files and testimony sought are not relevant because this information was not considered by PECO in its decision to hire McAndrews. (PECO's Brief at 4.) The issue in this case is whether or not PECO acted impermissibly by not promoting the plaintiff and instead hiring McAndrews for the Market Research Supervisor position. If PECO had access to PHA files at the time of its decision, and if, as the plaintiff seems to believe, those files call into question McAndrews' qualifications for the position, or her credibility, [6] then the files would be relevant. They could be used to infer that PECO hired McAndrews despite knowing, at the time of the decision, that she was not qualified for the job, or was a liar. This could lead the fact finder to infer that the personnel decision was motivated by discrimination, not legitimate business reasons. However, [*7] since there is no indication that PECO had access to this information at the time of the decision at issue, then even if the files clearly establish that McAndrews was not qualified for the position, they say nothing about whether PECO's decision was discriminatorily motivated. Therefore, they are not relevant.

6   The plaintiff seems to believe that the files contain information that contradicts McAndrews' claim, made both at a recent deposition and, apparently, right before she was hired by PECO, that she saved the PHA $ 650,000 in her first year of employment there.

PECO and the PHA rest their argument on the Third Circuit's recent opinion in *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221 (3d Cir. 1994). While this case is not as squarely on point as PECO and the PHA urge, it does provide guidance. *Mardell* is a prototypical "after-acquired evidence" employment discrimination case. Having been fired from Harleysville Insurance, Mardell sued her former employer for age and sex [*8] discrimination. During discovery, Harleysville unearthed several instances of employment application and resume fraud. Although at the time of the termination, Harleysville did not know of the plaintiff's misrepresentations, Harleysville argued that the "after-acquired" evidence precluded liability. The Third Circuit rejected this argument. [7] The court held that after-acquired evidence of fraud in plaintiff's resume and/or job application is irrelevant to the determination of whether the employer discriminated *at the time of the adverse employment action. Id.*

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 12 of 30 PageID #:434

1994 U.S. Dist. LEXIS 16187, *8; 66 Fair Empl. Prac. Cas. (BNA) 664

7    *The Tenth Circuit has concluded that such "after-acquired" evidence does bar employer liability.* Summers v. State Farm Mutual Automobile Ins. Co., 864 F.2d 700 (10th Cir. 1988). *The Supreme Court will hopefully resolve this split in the Circuits this Term in* McKennon v. Nashville Banner Publishing Co., 128 L. Ed. 2d 661, 114 S. Ct. 2099 *(granting certiorari).*

Mardell involved [*9] after-acquired evidence about the plaintiff. The present case involves evidence concerning the person who was promoted instead of the plaintiff. Therefore, this is not a classic "after-acquired evidence" case. However, *Mardell* establishes the principle that "the sole question to be answered . . . is whether the employer discriminated against the employee . . . *at the instant of the adverse employment action.*" Id. at 1228. The focus must be on the employer's action and state of mind at the time of the decision. If PECO did not use or have access to the PHA files pertaining to McAndrews in making its decision, those records are plainly irrelevant to the determination of whether PECO discriminated against the plaintiff. Therefore, they are not discoverable.

Even if the files are not relevant to establish that PECO discriminated, they may nevertheless be relevant to undermining McAndrews' credibility. McAndrews apparently testified in a deposition that she saved the PHA $ 650,000 during her first year of employment there. If the files indicate that this is not true, that information could be used to impeach McAndrews. However, if the personnel file is relevant only to impeach [*10] McAndrews, this is not sufficient to allow discovery of the file. Under Federal Rule of Evidence 613(b), witnesses may not be impeached on a collateral matter by use of extrinsic evidence. Whether or not McAndrews actually saved the PHA $ 650,000 when she worked there would not appear to be a "matter material to the substantive issues of the case," Cwach v. United States, 212 F.2d 520, 530 (8th Cir. 1954). Discovery designed to lead to no more than extrinsic evidence possibly bearing on the non-party witness' general veracity when not under oath will be denied.

It is important to note that the files the plaintiff wishes to discover are that of a non-party to this action. It is a generally accepted rule that standards for non-party discovery require a stronger showing of relevance than for party discovery. Laxalt v. McClatchy, 116 F.R.D. 455, 458 (D. Nev. 1986). Since the relevance of the information requested, for any purpose, is certainly in doubt, the fact that the discovery is sought from a non-party lends further support to my conclusion that the material is not subject to discovery.

Several federal decisions deal specifically [*11] with discovery of non-party personnel records. In Giraudo v. Henkels & McCoy, Inc., No. 93-458, 1993 U.S. Dist. LEXIS 14660, at * 2 (D. Or. October 7, 1993), the plaintiffs sued their former employer for sexual harassment, discrimination by retaliation in employment, and assault. The plaintiffs sought discovery of personnel files of non-parties. The defendant objected to this request on the grounds that "production of the personnel files of non-parties would be an unwarranted invasion of the privacy rights and expectations of those non-parties." The court denied the plaintiffs' motion to compel and responded:

> Plaintiffs offer no legal authority to support their position that non-party personnel files are routinely discoverable. Moreover, plaintiffs have not alleged facts in this case which would indicate that the wage records, interview records, payroll records, work histories, employment applications, or job descriptions of these non-party employees are relevant to their claims.

The plaintiffs in Koppman v. South Cent. Bell Tel. Co., No. 90-4503, 1991 U.S. Dist. LEXIS 15079, at * 5 (E.D. La. October 6, 1991), alleged, [*12] as in the instant case, that they were denied a promotion in violation of Title VII and the ADEA. The plaintiffs argued that the "qualifications or lack of qualifications, experience, performance record, etc." of the non-party who was given the position in their stead were "relevant to determining whether there was a legitimate business reason for selecting" him instead of the plaintiffs. The court ultimately concluded that the files "contained personnel data such as family relations, earnings, attendance records, references to medical insurance and treatment . . . and other irrelevant information. The information sought does not appear reasonably calculated to lead to the discovery of admissible evidence."

Given the lack of relevance of the information the

1994 U.S. Dist. LEXIS 16187, *12; 66 Fair Empl. Prac. Cas. (BNA) 664

plaintiff seeks to discover, and the non-party status of the PHA and Hillary McAndrews, the plaintiff's motion to compel will be denied. An appropriate order follows.

*ORDER*

Upon consideration of plaintiff's motion to compel the Philadelphia Housing Authority (PHA), a non-party, to comply with a deposition subpoena requesting testimony and production of personnel files and other documents relating to Hillary McAndrews, a non-party [*13] former employee of the PHA, and for an award of counsel fees, and the answers and briefs filed by the PHA and the defendant Philadelphia Electric Company (PECO), plaintiff's motion is DENIED for the reasons set forth in the accompanying memorandum.

BY THE COURT:

Donald W. VanArtsdalen, S.J.

# __EXHIBIT C__

**EXPERIAN INFORMATION SOLUTIONS, INC.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF ORDER PERMITTING DEFENDANTS TO
SHARE INFORMATION CONCERNING LARQUETTE GREEN IN DISCOVERY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| BRIANNA GREENE, <br><br> Plaintiff, <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES, INC., et al. <br><br> Defendants | Civil Action No. 1:09-CV-7547 <br><br> Hon. Judge Blanche M. Manning <br><br> Magistrate Judge Maria Valdez |

### DECLARATION OF KATHLEEN M. CENTANNI

I, Kathleen M. Centanni, declare and state as follows:

1.    Since May 2003, I have been employed as a Compliance Manager for Experian Information Solutions, Inc. ("Experian"), formerly known as TRW Information Systems ("TRW"). From August 2000 to May 2003, I held the position of Internal Auditor and Internal Auditor Senior in Experian's Internal Audit Department. I began my career with TRW/Experian in September 1990 as Credit and Collection Manager. Prior to joining TRW, I spent seventeen years with one of the nation's largest retailers and credit grantors, Sears Roebuck & Co. During that time, I was responsible for managing several credit and collections departments as well as Credit Authorization, where thousands of consumer applications for credit and consumer credit reports were evaluated.

2.    Based on my experience, I am knowledgeable about Experian's policies and procedures for the compilation, retention, reinvestigation and disclosure of consumer credit information. I also have reviewed thousands of credit reports, and as a result, I have substantial knowledge about common patterns that occur in the way consumers identify themselves when applying for credit.

3.    The facts stated in this declaration are true of my own personal knowledge, and if called to testify to them, I would competently do so.

4.    Experian operates a consumer credit reporting agency pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* As a credit reporting agency, Experian acts as a conduit of credit information that is pertinent to prudent credit granting and related decisions. Experian gathers information originated and voluntarily provided to Experian by "furnishers," such as credit card issues, auto dealers, lenders, and other creditors. Experian makes this information available to its "subscribers," parties engaged in credit related transactions. Thus, Experian does not originate or create any credit information and Experian does not make loans or decide who should receive credit. Both these functions are handled entirely by the credit granting industry, over which Experian has no control.

5.    Furnishers report credit information relating to individual consumers to Experian identified as "trade lines" which can consist of credit account information such as account number, account status, and balance information. Along with the trade lines, furnishers report certain consumer identifying information associated with the trade line.

6.    Experian's computer system stores data which is linked to consumer identifying information supplied by credit grantors. Therefore, when a request or an inquiry for a consumer credit report is submitted, Experian's databases compare and match the identifying information provided in the inquiry string to the identifying information reported with each trade line. Accordingly, a credit report is created only at the time the inquiry for it is received.

7.    Plaintiff alleges that Experian "mixed" her credit file with another consumer, Larquette Green.

8.    Controls built in Experian's computer systems prevent a trade line belonging to an individual from reporting simultaneously on more than one consumer credit file.

9.      No trade lines reported on Plaintiff's credit file appear in Larquette Green's credit file.

10.     Larquette Green's credit file only contains the name variations "Larquette Green," "Laquette Green," "Larquette M.Green" and "Laroquette Green."

11.     Larquette Green's credit file does not contain the name "Brianna Greene."

12.     The information appearing on an individual consumer's disclosure or consumer report provides little to no insight into the procedures used by Experian to compile and report consumer credit information.

13.     Experian is diligent in protecting its methods for compiling and reporting consumer credit information on its consumer disclosures or consumer reports based on business and security concerns.  Experian's methods and procedures for compiling consumer credit information are highly confidential trade secrets which form the backbone of Experian's proprietary credit reporting system.  Experian excludes such information from its consumer reports, among other reasons, to prevent its competitors and or potential identify thieves from discovering and/or reverse engineering Experian's proprietary methods and procedures for compiling consumer information into specific consumer credit reports.

14.     Experian has not been given written consent from Larquette Green to provide her consumer disclosure to any outside parties; therefore, Experian has no permissible purpose to access the credit information.

This declaration is executed under penalty of perjury, pursuant to 28 U.S.C. § 1746, on May 5th, 2010 in Costa Mesa, California.

Kathleen M. Centanni

3

# **EXHIBIT D**

**EXPERIAN INFORMATION SOLUTIONS, INC.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF ORDER PERMITTING DEFENDANTS TO
SHARE INFORMATION CONCERNING LARQUETTE GREEN IN DISCOVERY**

LEXSEE



Cited
As of: May 05, 2010

## CONCORD BOAT CORPORATION, et al, Plaintiffs, v. BRUNSWICK CORPORATION, A DELAWARE CORPORATION, Defendant.

### 96 C 6026

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### 1996 U.S. Dist. LEXIS 18012

### December 3, 1996, Decided
### December 4, 1996, DOCKETED

**DISPOSITION:** [*1] Plaintiffs' motion to compel denied.

**COUNSEL:** For CONCORD BOAD CORPORATION, plaintiff: Robert Edwin Bouma, James W. Lovett, McDermott, Will & Emery, Chicago, IL. Brooks F. Poley, Robert Weinstine, K. Craig Wildfang, Wintrhop & Weinstine, P.A., Minneaplis, MN. For VIVIAN INDUSTRIES, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For FIBER SPORT, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For GALAXIE BOAT WORKS, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For SEA ARROW MARINE, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For MARIAH BOATS, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For HARRIS

KAYOT, INC., plaintiff: Robert [*2] Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For ARMADA MANUFACTURING COMPANY, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For BAHA CRUISERS/FRP INDUSTRIES, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For CAMPION MARINE, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For CARAVELLE BOATS, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For KCS INTERNATIONAL, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For MIRAGE HOLDINGS, INC., plaintiff: Robert Edwin Bouma, [*3] (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K.

Craig Wildfang, (See above). FOR PLAY TIME MFG., by Ohio Marine Distr., Inc., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For POWERQUEST BOATS, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For SILVERTON MARINE CORPORATION, plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For WTYS NO. 4, INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For CENTURY CRAFT INDUSTRIES, LTD., fka Vanguard Industries, plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For INDEPENDENT BOAT BUILDERS, INC., [*4] plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For AVENGER MANUFACTURING, plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For G.W. INVADER, plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For MALIBU BOATS WEST, plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For MAVERICK BOAT CO., INC., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above). For WEERES INDUSTRIES CORP., plaintiff: Robert Edwin Bouma, (See above). James W. Lovett, (See above). Brooks F. Poley, (See above). Robert Weinstine, (See above). K. Craig Wildfang, (See above).

For BRUNSWICK CORPORATION, a Delaware corporation, defendant: Robert [*5] Forge Finke, T. Mark McLaughlin, Andrew Stanley Marovitz, Mary Ann Spiegel, Mayer, Brown & Platt, Chicago, IL. Daniel A. Dupre, Robert T. McNaney, Brunswick Corporation,

Lake Forest, IL.

For NATIONAL MARINE MANUFACTURERS ASSOCIATION, INC., deponent: David Barry Goroff, Robert C. Feldmeier, Hopkins & Sutter, P.C., Chicago, IL. Mary Claire O'Neil, Hopkins & Sutter, Chicago, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge

**OPINION BY:** Charles P. Kocoras

**OPINION**

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

This matter is before the court on a motion to compel third party National Marine Manufacturers Association to comply with a subpoena duces tecum. For the reasons set forth below, this motion is denied.

**BACKGROUND**

This motion has been filed by Concord Boat Corporation and other plaintiffs in an action in the United States District Court for the Eastern District of Arkansas (collectively "Concord" or "plaintiffs") seeking to compel the National Marine Manufacturers Association ("NMMA"), a third-party not directly involved in the Arkansas suit, to fully comply with a subpoena duces tecum. The Arkansas suit, file number LR-C-95-781, is an action under [*6] the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Antitrust Act, 15 U.S.C. § 12 *et seq.* The plaintiffs, members of the recreational marine industry, allege that defendant Brunswick Corporation ("Brunswick") is engaging in various types of anticompetitive behavior. *See* NMMA's Memorandum in Opposition to Plaintiff's Motion to Compel ("NMMA's Memorandum") at 1-2.

The NMMA is a trade association for the recreational marine industry that represents manufacturers and other marine products companies. One of the services that the NMMA provides to its members is the collection and analysis of statistical data concerning various aspects of boating equipment in the United States, the results of which are published by the NMMA in its Monthly Statistical Report of the Recreational

Marine Industry ("Monthly Report"). Thus, while the NMMA collects data from individual companies, it reports the information in the aggregate, reflecting the industry as a whole. The information reported by each company includes the number of its products which were shipped during the prior month and the wholesale value of these shipments. Since this information is potentially valuable to [*7] competitors, the manufacturers that submit data to the NMMA have required assurances that the information they provide will be kept confidential. *See* NMMA's Memorandum at 5-6.

## DISCUSSION

The NMMA objects to requests 7, 8, and 10 of Concord's subpoena on the grounds that they are "vague and ambiguous" and because they seek "highly confidential commercial information." The relevant requests seek the following information:

7. All documents, information or data in any form submitted by Association members to the Association relating to the period from January 1, 1990 through April 1, 1996 which report, categorize, set forth, summarize, evaluate, estimate or project, on a monthly, quarterly, seasonal, annual or periodic basis: (a) revenues, expenses and profits and losses from the sale of stern drive marine engines; (b) revenues, expenses and profits and losses from the sale of outboard marine engines; (c) revenues, expenses and profits or losses from the sale of stern drive boats; (d) production or manufacturing capacity, production or manufacturing volume, actual sales information regarding stern drive marine engines, outboard engines, stern drive boats and/or outboard [*8] boats; and (e) revenues, expenses and profits and losses from the sale of outboard boats.

8. Documents relating to any and all monthly and/or quarterly financial statements, including without limitation, balance sheets, income statements, and related work papers, compilations, review or opinions furnished by Association members to the Association.

10. Documents relating to any and all reports by all manufacturers that provide data that is used in compiling the statistical data such as the attached July 1995 NMMA Monthly Statistical Report of the Recreational Marine Industry, or any similar report relating to the period from January 1, 1990 through April 1, 1996.

*See* Affidavit of Brooks F. Poley exh. E. Because we find that these requests are overbroad and that Concord has failed to sufficiently demonstrate the necessity of such information in this case, we deny its motion to compel.

When a party seeks protection from a subpoena, a district court "must apply a balancing test to determine whether the need of the party seeking disclosure outweighs the adverse effect such disclosure would have on the policies underlying the [claimed] privilege." *Deitchman v. [*9] E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir. 1984), quoting *Equal Employment Opportunity Commission v. University of Notre Dame du Lac*, 715 F.2d 331, 338 (7th Cir. 1983). When confidential information is being sought, "the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *The Stanley Works v. Newell Co.*, 1992 U.S. Dist. LEXIS 13817, 1992 WL 229652 at *2 (N.D.Ill. 1992), quoting *Greater Rockford Energy and Technology Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 534 (C.D.Ill. 1991)(other citations omitted). For these purposes, information is considered relevant if it encompasses any matter that bears on or might reasonably lead to matters that could bear upon any issue in the case at hand. *Id.*, quoting *Greater Rockford*, 138 F.R.D. at 534 (other citations omitted).

In applying the balancing test, this court must consider a number of factors. These include the relevance of the requested information to the underlying litigation, the party seeking discovery's need for the information, whether the requests are burdensome, [*10] the fact that the party from whom discovery is being requested is a non-party to the underlying case, and the fact that the disclosure would be made to competitors. *See Stanley Works*, 1992 WL 229652 at *3, citing *Greater Rockford*, 138 F.R.D. at 534. With these factors in mind, we will

turn to a discussion of their implications to the motion before us.

As a preliminary matter, it is readily apparent, and uncontested by the parties, that the information sought by Concord is confidential information. The documents which Concord seeks contain pricing information of individual manufacturers of marine equipment, information which is not generally known and which the manufacturers do not make publicly available. Since the information sought is confidential, therefore, we will move to a discussion of the various factors which guide our inquiry.

Concord argues that the requested documents are relevant and necessary in this case because they will help establish the "relevant markets" involved, a necessary element in an antitrust action. See *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S. Ct. 884, 891, 122 L. Ed. 2d 247 (1993). However, Concord has not sufficiently demonstrated [*11] that these broad requests are truly necessary to determine such markets. It is not clear that Concord cannot glean the necessary information from the documents which it received from its other requests, which include information on Brunswick's sales and sales in various parts of the recreational marine industry as a whole. Outside of assertions that the requested documents are "critical" to discovering the relevant markets and to check the accuracy of the NMMA's statistical reports, there is no evidence that these documents are necessary in light of these other documents which were already produced. Mere assertions of necessity are insufficient to establish that these documents are relevant in the instant case, and this factor tends to weigh against our granting Concord's motion.

In addition, the contested document requests are broad, and compliance by the NMMA would likely be burdensome. Concord is seeking almost six years' worth of documents from an unenumerated set of NMMA members, covering data on revenues, expenses, profits, and losses from various types of marine equipment. The three requests are therefore likely to encompass a great deal of information, the collation and production [*12] of which would take a great deal of time and effort. In addition, it is clear that the NMMA is a non-party to this suit, with no real interest in the outcome of the litigation. Therefore, the burden which would likely be placed on the NMMA by these requests weighs against our granting

this motion.

Lastly, disclosure of the requested information by the NMMA would be to competitors in the same industry, another factor which weighs against this subpoena. Concord and the other plaintiffs are all manufacturers in the recreational marine equipment industry, and are seeking sales information from other manufacturers in the same industry. The requested information, therefore, is from competitors, and divulging it to the plaintiffs raises antitrust issues of a different sort. Therefore, we find that all of the factors weigh against our compelling the production of the requested documents, and we must deny Concord's motion.

Concord argues that the NMMA has waived many of its objections to the current subpoena because they were not filed within the limit imposed by Fed.R.Civ.P. 45. We disagree with Concord and find that the NMMA's objections are appropriate in this instance. Concord also argues [*13] that the protective order which was entered into in this case is sufficient to allay the NMMA's fears that confidential information may be used in an inappropriate manner and that we should therefore reject the NMMA's objections to discovery. However, it is established that even when a protective order has been entered, a party requesting disclosure of confidential material "must make a strong showing of need, especially when confidential information from a nonparty is sought." *Greater Rockford*, 138 F.R.D. at 538, quoting *Litton Industries, Inc. v. Chesapeake & Ohio Railway Co.*, 129 F.R.D. 528, 531 (E.D.Wis. 1990). Since Concord has failed to make a strong showing of need, as discussed above, we find that this argument is without merit.

Therefore, because Concord has failed to show that it truly needs the information sought in requests 7, 8, and 10 of its subpoena, and because we believe that the requests are overly broad on their face, we deny Concord's motion to compel.

## CONCLUSION

For the reasons set forth above, the plaintiffs' motion to compel [*14] is denied.

Charles P. Kocoras

United States District Judge

Dated: *December 3, 1996*

# <u>EXHIBIT E</u>

**EXPERIAN INFORMATION SOLUTIONS, INC.'S OPPOSITION TO
PLAINTIFF'S MOTION FOR ENTRY OF ORDER PERMITTING DEFENDANTS TO
SHARE INFORMATION CONCERNING LARQUETTE GREEN IN DISCOVERY**

LEXSEE



Cited
As of: May 05, 2010

**THE STANLEY WORKS, a Connecticut Corporation, Plaintiff, vs. NEWELL CO.,
a Delaware Corporation, Defendant.**

**Case No. 92 C 20157**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, WESTERN DIVISION**

**1992 U.S. Dist. LEXIS 13817; 1992-2 Trade Cas. (CCH) P70,044**

**August 27, 1992, Decided
August 27, 1992, Filed**

**NOTICE:**   [*1]  NOT FOR PUBLICATION

**DISPOSITION:**   Stanley's motion to compel National to produce is granted as to request number six and denied as to requests one, two, three, four, five and seven.

**COUNSEL:** ATTORNEYS FOR PLAINTIFF: Timothy A. Nelsen, Donna L. McDevitt, Skadden, Arps, Slate, Meagher & Flom, 333 West Wacker Drive, Suite 2100, Chicago, IL 60606.

ATTORNEYS FOR DEFENDANT: R. Mark McCareins, Julie A. Bauer, Winston & Strawn, 35 West Wacker Drive, 41st Floor, Chicago, IL 60601.

**JUDGES:** REINHARD

**OPINION BY:** PHILIP G. REINHARD

**OPINION**

　　*ORDER*

　　*INTRODUCTION*

　　This case is before the court on plaintiff's, The Stanley Works (Stanley), motion to compel National

Manufacturing Co. (National), a relatively small, privately held corporation, to produce and permit inspection and copying of certain documents pursuant to Federal Rules of Civil Procedure (F.R.C.P.) 34(c) and 45. National, who is not a party to the underlying litigation, filed in the District of Connecticut between Stanley and Newell Co., contends that the motion should be denied because Stanley has not shown that its need for the requested documents and information outweighs the harm which would result to National from disclosure of these sensitive and confidential materials  [*2]  to its direct competitors.

　　*FACTS*

　　Stanley, Newell and National are direct competitors in the manufacture and sale of cabinet hardware, window hardware, closet hardware, consumer and residential door hardware and wire goods. On December 11, 1991, Stanley filed its amended complaint against Newell in the United States District Court for the District of Connecticut. The complaint alleges that Newell's proposed business combination with Stanley violates section 7 of the Clayton Act, 15 U.S.C. § 18, section 1 of the Sherman Act, 15 U.S.C. § 1, and the Connecticut Anti-Trust Act, Conn. Gen. Stat. § 35-26. Stanley further seeks a judgment declaring that the company's employee's stock ownership plans' purchase of

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 26 of 30 PageID #:448

1992 U.S. Dist. LEXIS 13817, *2; 1992-2 Trade Cas. (CCH) P70,044

approximately 5 million shares of Stanley common stock is valid and lawful.

Stanley and Newell entered into a stipulated protective order regarding discovery of documents and information. The protective order provides that the parties may designate documents as "Confidential" or "Highly Confidential." A "Highly Confidential" designation restricts access to the documents to the following people: the Court; counsel for either party and their legal and clerical staffs; court [*3] reporters; any deposition witness who has previously had access to the documents, material or information; outside experts, advisors and/or translators consulted by the parties or their counsel in connection with this litigation, whether or not they are retained to testify at trial; governmental law enforcement agencies pursuant to valid subpoena; and any other person that the parties agree to in writing. The order further provides that "Highly Confidential" materials may be disclosed to any officer, director or employee of the receiving party if the producing party consents. In the event that the producing party objects, the receiving party may seek a prompt hearing before the court for an order allowing the proposed disclosure.

A "Confidential" designation permits access to all of the persons listed above, and, in addition, provides for disclosure to "those officers, directors, and employees of the parties to this action deemed necessary to aid counsel in the prosecution and defense of this action."

On March 25, 1992, Stanley served National with a subpoena *duces tecum* directing it to produce various documents. Specifically, the subpoena requests the following:

1. Documents [*4] sufficient to show National Manufacturing Co.'s annual dollar volume of U.S. sales of each Relevant Product [1] for each year 1987 through 1991.

2. Documents sufficient to show National Manufacturing Co.'s approximate annual sales, or percentage of sales, in each of the following distribution channels for each year 1987 through 1991:

(a) major mass merchants, such as K Mart, Sears, and WalMart;

(b) home centers, such as Home Depot, Builders Square, and Hechinger;

(c) independent distributors, such as Masbach and Emery Waterhouse; and

(d) dealer-owned or cooperative hardware distributors, such as Cotter & Company (True Value Hardware Stores), Ace Hardware Corp., Servistar Corp. (formerly known as American Hardware Supply Co.), and Hardware Wholesalers, Inc.

3. For each channel identified in the previous request, documents sufficient to show whether such Relevant Product sold by National Manufacturing Co. is sold individually or as part of a program or line of products and if so, documents sufficient to show each other product that is part of the program or line of products.

4. Documents sufficient to show the use of VMI [2] by National Manufacturing Co. or any other method by [*5] which National Manufacturing Co. manages its customers' inventory. [3]

5. All documents concerning competition between or among National Manufacturing Co., Stanley, Newell or Black & Decker Corp. in (a) the production, sale, or distribution of any Relevant Product, and/or (b) the provision of VMI, or any other inventory control services.

6. One copy of each current product catalog, brochure and price list, relating to each Relevant Product sold by National Manufacturing Co. in the United States.

7. Documents sufficient to show National Manufacturing Co.'s estimates of market shares, in the United States in the sale of any Relevant Product.

1    The term "Relevant Product" includes the following: cabinet hardware, drapery hardware, window hardware, closet hardware, wire goods, locking pliers, snips, hex keys, clamps, boring tools, paint preparation tools, manual paint applicators, glue guns, staplers, fasteners, power tools, screwdrivers, saws, plans, automobile aftermarket pneumatic sanding tools, closet organizers, office supplies and any other product believed to be competitive with the product categories listed above.

[*6]

2    VMI (vendor managed inventory) refers to arrangements whereby a retailer designates a

1992 U.S. Dist. LEXIS 13817, *6; 1992-2 Trade Cas. (CCH) P70,044

certain amount of store shelf space to a supplier for the supplier to choose products and manage shelf space inventory and turnovers.

3   This presumably includes "EDI" or electronic data interchange--an arrangement pursuant to which a vendor electronically performs the monitoring, inventorying, purchasing, and billing functions for a retailer.

National, in a letter dated March 26, 1992, objected, contending that the document request is overly broad and burdensome and calls for highly confidential and proprietary information. Stanley filed this motion to compel production of the documents.

### DISCUSSION

F.R.C.P. 45(c), as amended in 1991, provides that if a person served with the subpoena objects to the inspection and copying of the designated materials, the party serving the subpoena is not entitled to the requested discovery except by court order. F.R.C.P. 45(c)(2)(B). The serving party may move the court for an order to compel production. F.R.C.P. 45(c)(2)(B). The Advisory Committee Notes to [*7] Rule 45 indicate that the new subdivision (c), which states the rights of witnesses, is not intended to diminish rights conferred by Rules 26-37. The notes further indicate that many of these provisions parallel F.R.C.P. 26.

When protection from disclosure is sought, the court "must apply a balancing test to determine whether the need of the party seeking the disclosure outweighs the adverse effect such disclosure would have on the policies underlying the [claimed] privilege." *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 559 (7th Cir. 1984) (quoting *EEOC v. University of Notre Dame du Lac,* 715 F.2d 331, 338 (7th Cir. 1983). If confidential information is being sought, "the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Greater Rockford Energy and Technology Corp. v. Shell Oil Co.,* 138 F.R.D. 530, 534 (C.D.Ill. 1991) (quoting *Litton Indus. v. Chesapeake & Ohio Ry,* 129 F.R.D. 528, 530 (E.D.Wis 1990)); 8 Charles A. Wright [*8] and Arthur R. Miller, Federal Practice and Procedure § 2043 at 301-02 (1970). Information is relevant if it encompasses "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the

case." *Greater Rockford,* 138 F.R.D. at 534 (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978)).

In balancing the competing interests involved, the court will consider the following factors: (1) the relevance of the requested information to the present litigation; (2) the party seeking discovery's need for the information; (3) whether the requests are burdensome; (4) the fact that National is a nonparty; and (5) the fact that the disclosure would be made to National's competitors. *Greater Rockford,* 138 F.R.D. at 534. With the above principles in mind, the court turns to the merits of the controversy.

### A. CONFIDENTIALITY

National has submitted an affidavit of its Senior Vice President of Corporate Development, John W. McConnell, which establishes that the information sought by Stanley is, indeed, confidential. McConnell states that the requested information [*9] is tightly safeguarded and is only available to National's top management, sales and marketing staffs. The information is not disclosed to persons outside National, other than consultants, and never to National's competitors.

McConnell further provides the court with a basis for understanding why this information is confidential. He states that information concerning National's sales of various products, its product lines, and its distribution channels could enable Stanley to compete more effectively by focusing on products or distribution channels of which National has a relatively small share. Information about National's inventory management services would enable Stanley to compete by offering the same or what it touts as "better" services to those customers.

McConnell did state that National has agreed to produce the product catalogs, brochures and price lists sought in Stanley's request number six.

This affidavit is uncontested. Stanley has not shown that the representations in this affidavit are false and makes no argument that the information sought from National is not confidential. Thus, the court finds no reason to doubt the veracity of McConnell's representations and finds [*10] that Stanley's requests, except for number six, relate to confidential information.

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 28 of 30 PageID #:450

1992 U.S. Dist. LEXIS 13817, *10; 1992-2 Trade Cas. (CCH) P70,044

## B. RELEVANCY

Once it is shown by National that confidential information is being sought, the burden shifts to Stanley to establish that the information is "sufficiently relevant" to its case. *Greater Rockford,* 138 F.R.D. at 534. Where a court's only connection to an action in another district is the supervision of ancillary discovery, it must be "especially hesitant to pass judgment on what constitutes relevant evidence." *Truswal Systems Corp. v. Hydro-Air Eng'g, Inc.,* 813 F.2d 1207, 1212 (Fed. Cir. 1987) (quoting *Horizons Titanium Corp. v. Norton Co.,* 290 F.2d 421 (1st Cir. 1961)). Where relevance is in doubt, the court should be permissive. *Truswal,* 813 F.2d at 1212.

Stanley has submitted the affidavit of Michael L. Weiner, which states that the discovery sought from National is relevant to Stanley's claim against Newell. While this is nothing more than a bare assertion, it is nonetheless uncontested by National. National has not argued that any of the information is irrelevant to the lawsuit. Therefore, this court [*11] finds that the documents requested by Stanley are, indeed, relevant to its suit against Newell.

## C. NECESSITY

In addition to relevancy, Stanley must show that the information sought from National is sufficiently necessary to the case to outweigh the harm that disclosure would cause to National. *Greater Rockford,* 138 F.R.D. at 534.

Stanley argues that discovery from National is essential to enable it to demonstrate current competitive conditions, including industry market shares and other information relevant to the competitive effects of Newell's proposed acquisition in each of the markets where Newell and Stanley compete. Stanley further asserts that it does not possess this information and that it is not available from Newell, trade associations or the public domain.

National argues that Stanley has not met its burden because it has produced absolutely no evidence, in the form of affidavits or otherwise, that the information it seeks is not available from any other sources, including Newell. Stanley replies that National has not pointed to any trade associations or other publicly available sources for the information sought, and has not shown that it

would [*12] be injured by disclosure of its market share estimates.

Whether or not National has pointed to any outside sources for the information requested is irrelevant. As mentioned above, National has shown that the information is confidential. The burden then shifts to Stanley to show that its need for the information outweighs the harm disclosure would cause to National. *Greater Rockford,* 130 F.R.D. at 534; 8 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2043 at 301-02 (1970). Stanley has not met its burden. [4]

> 4    Stanley could, once discovery in the underlying suit is completed, file a renewed motion contending that the requested information is still unavailable from any source.

### 1. Requests One, Two and Three

Requests one, two and three seek documents concerning National's annual sales for each "relevant product," documents showing National's annual sales through particular major customers, and documents showing whether its products sold to the major customers are sold [*13] individually or as part of a program or line of products and, if so, documents showing what other products are included as part of the program or product line. Stanley has not shown a compelling need for this information sufficient to outweigh National's interest in confidentiality.

The court agrees that the release of information disclosing which distribution channels National participates in and the methods in which it sells its products through those channels could put it at a competitive disadvantage. National maintains that the possession of this information by its competitors could enable them to focus on those markets or distribution channels of which National has a relatively small share. Stanley has not shown any need sufficient to outweigh this potential harm. *See The Stanley Works v. Newell Co.,* No. 8:CV 92-00145, slip op. at 5 (D.C. Neb. May 15, 1992), *aff'd,* 8:CV 92-00145 (D.C. Neb. July 9, 1992).

### 2. Request Four

Request four seeks documents relating to National's inventory control services. The release of this information would put National at a competitive disadvantage.

Case: 1:09-cv-07547 Document #: 105-2 Filed: 05/05/10 Page 29 of 30 PageID #:451

1992 U.S. Dist. LEXIS 13817, *13; 1992-2 Trade Cas. (CCH) P70,044

Stanley or any other competitor could use this information and focus on markets which [*14] National may not offer such services to and to take advantage of any weakness which would harm National. Stanley has not shown that its need for documents relating to these services outweigh National's confidentiality interest in these documents.

### 3. Requests Five and Seven

Requests five and seven seek documents regarding competition between National, Stanley and Newell in the production, sale, distribution of any "relevant product" and inventory services, as well as all documents regarding market share. Such information relating to National's competitive position in the marketplace and how it competes or intends to compete with Stanley and Newell is certainly sensitive information. *See Stanley,* No. 8:CV 92-00145, slip op. at 5-6. Again, Stanley has not adequately persuaded this court how its need for this information outweighs National's interest in its confidentiality. In its Supplemental and Amended Complaint it appears that Stanley, in fact, possesses market share data as to itself and Newell, the two parties to this litigation. Further, as National argues, Stanley and Newell are just as likely as National to possess documents regarding the competition between the three [*15] companies. Therefore, Stanley has failed to meet its burden with respect to requests five and seven also.

### D. Use of the Protective Order

Stanley argues that the use of a protective order in this case, which was executed between Stanley and Newell, adequately protects National from any competitive injury. A court should not "readily assume that attorneys who signed the protective order, and who must scrupulously maintain the security of confidential information disclosed under it will ignore their duties or fail to impress the seriousness of them on all others who are permitted access to such information." *Greater Rockford,* 138 F.R.D. at 533.

Stanley and National are direct competitors and thus have many common potential customers. If Stanley were able to obtain National's sales records, the effect on National could be devastating. *See Greater Rockford,* 138 F.R.D. at 537. It is understandable that National does not wish to risk disclosure of this information despite the existence of a protective order.

Even "Highly Confidential" information is required to be disclosed to Stanley's experts. Thus, as the court in *Greater Rockford* noted:

[*16] Once an expert has digested this confidential information, it is unlikely that the expert will forget. The expert's raison d'etre is to assimilate information in his or her chosen field and formulate that material into various theories. The information obtained . . . will be added to the expert's repository of other information for possible future use. Even with stern sanctions for unauthorized disclosure, how does one practically police a protective order? If the expert is called upon two years after this litigation to assist a potential competitor in structuring its business, will he really be able to compartmentalize all he or she has learned and not use any of the information obtained [from National]?

. . . There is a constant danger inherent in disclosure of confidential information pursuant to a protective order. Therefore, the party requesting disclosure must make a strong showing of need, especially when confidential information from a nonparty is sought.

*Greater Rockford,* 138 F.R.D. at 537-38 (citations omitted) (quoting *Litton Industries,* 129 F.R.D. at 531). Stanley has failed to make such a strong showing of need for the information [*17] which outweighs National's significant confidentiality interests.

This court also notes that the protective order in this case is less protective than that in *Greater Rockford.* For instance, documents classified as "Confidential" may be shown to "those officers, directors, and employees of the parties to this action deemed necessary to aid counsel in the prosecution and defense of this action." This was not so in *Greater Rockford. See Greater Rockford,* 138 F.R.D. at 532-33. Additionally, "Highly Confidential" documents may be disclosed to officers, directors and employees of a party upon notice and a hearing. Thus, the protective order does not sufficiently reduce the harm that could be caused by disclosure.

### *CONCLUSION*

For the foregoing reasons, Stanley's motion to compel National to produce is granted as to request number six and denied as to requests one, two, three, four, five and seven. The documents responsive to request number six shall be produced within 30 days of the date of this order.

1992 U.S. Dist. LEXIS 13817, *17; 1992-2 Trade Cas. (CCH) P70,044

**ENTER:**                                          UNITED STATES DISTRICT COURT

PHILIP G. REINHARD, JUDGE                    DATED: August 27, 1992